TURTLE ISLAND RESTORATION NETWORK; Center for Biological Diversity; and Kahea: The Hawaiian Environmental Alliance, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF COMMERCE; National Marine Fisheries Service; and Gary Locke, in his official capacity as Secretary of the Department of Commerce, Defendants,

and

Hawaii Longline Association, Defendant–Intervenor

Hawaii Longline Association, Plaintiff,

v.

National Marine Fisheries Service; and Gary Locke, in his official capacity as Secretary of the Department of Commerce, Defendants.

CV. Nos. 09–00598 DAE–KSC, 10–00044 DAE–KSC.

United States District Court, D. Hawai'i.

Jan. 31, 2011.

Isaac H. Moriwake, Paul H. Achitoff, Earthjustice Legal Defense Fund, Honolulu, HI, for Plaintiffs.

Erik E. Petersen, U.S. Department of Justice, Washington, DC, Rachel S. Moriyama, Office of The United States Attorney, Honolulu, HI for Defendants.

George w. Brandt, Steven Y. Otaguro, Lyons Brandt Cook & Hiramatsu, Jeffrey W. Leppo, Ryan P. Steen, Stoel Rives LLP, Seattle, WA, Honolulu, HI, for Defendant–Intervenor.

*ORDER: (1) GRANTING PLAINTIFFS' AND FEDERAL DEFENDANTS' JOINT MOTION TO ENTER STIPULATED INJUNCTION AS AN ORDER OF THE COURT; (2) DENYING AS MOOT HLA'S MOTION FOR SUMMARY JUDGMENT*

DAVID ALAN EZRA, District Judge.

On December 15, 2010, the Court heard Plaintiffs' and Federal Defendants' Joint Motion to Enter Stipulated Injunction as an Order of the Court. ("Joint Motion," Doc. # 102.) Paul H. Achitoff, Esq., appeared at the hearing on behalf of Plaintiffs Turtle Island Restoration Network, Center for Biological Diversity, and KAHEA: The Hawaiian–Environmental Alliance (collectively, "Plaintiffs"); Erik E. Petersen, Esq., Frederick W. Tucher, Esq., and Elena Onaga, Esq. appeared at the hearing on behalf of Defendants United States Department of Commerce, National Marine Fisheries Service, and Gary Locke in his official capacity (collectively, "Federal Defendants"); Jeffrey W. Leppo, Esq. and Steven Y. Otaguro, Esq. appeared at the hearing on behalf of Intervenor–Defendant Hawaii Longline Association ("HLA"). After reviewing the motion

and the supporting, opposing, and supplemental memoranda, the Court GRANTS Plaintiffs' and Federal Defendants' Joint Motion to Enter Stipulated Injunction as an Order of the Court.[1] (Doc. # 102.) HLA's Motion for Summary Judgment is DENIED AS MOOT. (Doc. # 86.)

## BACKGROUND

Plaintiffs Turtle Island Restoration Network, Center for Biological Diversity, and KAHEA: The Hawaiian–Environmental Alliance (collectively, "Plaintiffs") are non-profit environmental organizations and corporations. On December 16, 2009, Plaintiffs filed a Complaint against Defendants United States Department of Commerce, National Marine Fisheries Service ("NMFS"), and Gary Locke ("Locke") in his official capacity as Secretary of the Department of Commerce (collectively, "Federal Defendants"). (Doc. # 1.) On January 5, 2010, Hawaii Longline Association ("HLA") filed a motion to intervene in the lawsuit (Doc. # 5), which U.S. Magistrate Judge Kevin S.C. Chang granted on February 12, 2010 (Doc. # 20). The Court dismissed Plaintiffs' Complaint without prejudice on June 24, 2010, 2010 WL 2608785, as a result of certain pleading deficiencies (Doc. # 82), and Plaintiffs filed a First Amended Complaint ("FAC," Doc. # 84) on the same day.

As recounted in the First Amended Complaint and the parties' various filings, management of the Hawaii longline fishery (the "Fishery") has been substantially litigated. This particular action stems from the December 10, 2009 Final Rule issued by NMFS implementing Amendment 18 to the Fishery Management Plan. (FAC ¶ 73.) Among other things, the Final Rule increases the annual number of allowable incidental interactions that occur between the fishery and loggerhead sea turtles.

The lawsuit also challenges the validity of the Biological Opinion that NMFS prepared to assess the Final Rule's impact on threatened and endangered species ("2008 BiOp") and the associated Incidental Take Statement ("ITS").

Plaintiffs advance six causes of action in the First Amended Complaint. Federal Defendants have allegedly violated the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 et seq., Sections 7 and 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq., the Magnuson–Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. (*Id.* ¶¶ 77–97.)

On April 5, 2010, Plaintiffs' action was consolidated with a case filed on January 22, 2010 by HLA against Locke and NMFS. (Cv. No. 10–00044, Doc. # 24.) HLA's suit sought declaratory and injunctive relief based on NMFS's alleged failure to issue determinations and authorizations pursuant to the Marine Mammal Protection Act and the Endangered Species Act. (Cv. No. 10–00044, Doc. # 1.) On December 16, 2010, HLA, NMFS, and Locke stipulated to voluntary dismissal of HLA's Complaint in the consolidated action. (Cv. No. 10–00044, Doc. # 29.)

On September 3, 2010, HLA filed a Motion for Summary Judgment on Plaintiffs' claims (Docs. ## 86–87) as well as a Concise Statement of Facts in Support of the Motion (Doc. # 88). This motion is currently set for hearing. (Doc. # 110.)

On October 13, 2010, Plaintiffs and Federal Defendants filed a Joint Motion to Enter Stipulated Injunction as an Order of

---

1. The consent decree is appended to this Order as Attachment 1.

the Court ("Joint Motion"), which in essence is a proposed consent decree that would result in dismissal of all of Plaintiffs' claims with prejudice.[2] ("Joint Mot.," Doc. # 102.) On November 24, 2010, HLA filed an Opposition to the Joint Motion. ("Opp'n," Doc. # 125.) Federal Defendants filed a Reply on December 1, 2010. ("Fed. Defs. Reply," Doc. # 126.) Plaintiffs filed a Reply on the same day. ("Pls. Reply," Doc. # 128.) At the December 15, 2010 hearing on the Joint Motion, the Court, concerned that it did not have sufficient information to analyze the proposed consent decree, directed the parties to file supplemental briefing as to whether the proposed consent decree was fair, reasonable, and equitable and in the public interest. (Doc. # 131.) Federal Defendants submitted their Supplemental Brief on December 30, 2010. ("Fed. Defs. Supp. Br.," Doc. # 133.) Plaintiffs filed their Supplemental Brief on December 31, 2010. ("Pls. Supp. Br.," Doc. # 134.) On January 14, 2011, HLA submitted its Supplemental Brief. ("HLA Supp. Br.," Doc. # 136.)

On November 12, 2010, HLA filed a LR 74.1 Appeal from Magistrate Judge's Non–Dispositive Discovery Order,[3] which arose from HLA's request to take five time-limited depositions of the Federal Defendants. (Doc. # 119.) HLA asserted that these five depositions were necessary for it to acquire information and evidence to oppose the Joint Motion, namely HLA sought to uncover evidence as to whether the proposed consent decree is "fair, rea-sonable, and equitable and does not violate the law or public policy." (*Id.* at 1, 4.) Federal Defendants objected to the proposed depositions (*id.* at 2–3), and on November 4, 2010, HLA and Federal Defendants submitted letter briefs to Magistrate Judge Chang, pursuant to the procedure set forth in Local Rule 37.1 (*see* Doc. # 116). On November 10, 2010, Magistrate Judge Chang sustained Federal Defendants' objection and prevented HLA's taking of the five proposed depositions. (Doc. # 117.) On December 17, 2010, this Court affirmed Magistrate Judge Chang's decision, finding that it was neither clearly erroneous nor contrary to law. (Doc. # 132.)

## STANDARD OF REVIEW

 Approval of a proposed consent decree is within the sound discretion of the court. *United States v. Oregon,* 913 F.2d 576, 580 (9th Cir.1990); *SEC v. Randolph,* 736 F.2d 525, 529 (9th Cir.1984). It is well-settled that the court should enter a consent decree if it determines that "it is fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club v. Elec. Controls Design, Inc.,* 909 F.2d 1350, 1355 (9th Cir.1990); *see also United States v. Montrose Chem. Corp. of Cal.,* 50 F.3d 741, 747 (9th Cir.1995). If the consent decree "comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate the

---

**2.** On the same day, and in response to Plaintiffs' and Federal Defendants' filing of the Joint Motion, HLA filed a Motion for Leave to File First Amended Complaint (Doc. # 103) as well as a Motion to Shorten Time for Hearing on its motion (Doc. # 104). After Magistrate Judge Chang denied the Motion to Shorten Time (Doc. # 107), HLA withdrew its Motion for Leave to File First Amended Complaint (Doc. # 115). On October 26, 2010, HLA filed a Complaint in a separate action against NMFS and Locke, alleging that the proposed consent decree contained in the Joint Motion is contrary to law and violative of the APA, the MSA, the ESA, and NEPA. (Cv. No. 10–00627, Doc. # 1.)

**3.** HLA also filed a Motion to Shorten Time (Doc. # 120), which this Court denied on November 15, 2010 for failure to show good cause (Doc. # 123).

statute upon which the complaint was based, the agreement should be entered by the court." *Hawaii's Thousand Friends, Life of Land, Inc. v. Honolulu*, 149 F.R.D. 614, 616 (D.Haw.1993) (quoting *Sierra Club*, 909 F.2d at 1355) (internal quotations omitted). Additionally, the court must "be satisfied that the decree represents a 'reasonable factual and legal determination.'" *Oregon*, 913 F.2d at 581 (quoting *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir.1981) (en banc) (per curiam) (Rubin, J., concurring)).

■ Although the court's discretion should be exercised in favor of the strong policy favoring voluntary settlement of litigation, *Ahern v. Cent. Pac. Freight Lines*, 846 F.2d 47, 48 (9th Cir.1988), when reviewing a consent decree, a district court must independently scrutinize its terms and avoid "rubber stamp approval." *Montrose Chem. Corp.*, 50 F.3d at 747; *see also Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525, 106 S.Ct. 3063, 92 L.Ed.2d 405 ("[A] federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." (citations and quotations omitted)); *Miami*, 664 F.2d at 440–41 ("The court ... must not merely sign on the line provided by the parties. Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval."); *United States v. Telluride Co.*, 849 F.Supp. 1400, 1402 (D.Colo.1994) (finding that the court may not "merely imprimit [the parties'] decision as though possessed of a clerical rubber stamp"). However, where as here, "a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement,' more deference to the parties' agreement is due because the district court 'must refrain from second-guessing the

Executive Branch.'" *Montrose Chem. Corp.*, 50 F.3d at 746 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990)).

## DISCUSSION

■ For the reasons set forth below, the Court concludes that the proposed consent decree is fair, reasonable, and equitable, and does not violate the law or public policy. The Court therefore grants Plaintiffs' and Federal Defendants' Joint Motion.

### I. *Amendment 18 and the Proposed Consent Decree*

On December 10, 2009, NMFS published in the Federal Register a Final Rule implementing Amendment 18 to the Fishery Management Plan, to be effective January 11, 2010. *See* 74 Fed.Reg. 65,460, 65,480 (Dec. 18, 2009) (codified at 50 C.F.R. pt. 300 & 665). NMFS published the proposed rule on June 19, 2009, and the public comment period ended on August 3, 2009. *Id.* at 65,461. NMFS received public comments and provided published responses. *Id.* The rule "removes the annual limit on the number of fishing gear deployments (sets) for the Hawaii-based pelagic shallow-set longline fishery, and increases the annual number of allowable incidental interactions that occur between the fishery and loggerhead sea turtles." *Id.* at 65,460. Under the Final Rule, the longline fleet is prohibited from interacting with "more than 46 loggerhead sea turtles or 16 leatherback sea turtles each year." *Id.* The rule also "removes the annual limits on shallow-set fishing effort and the requirements of the shallow-set certificate program found at 50 CFR 665.33, the related prohibitions at 50 CFR 665.22, and the definition of a shallow-set certificate found at 50 CFR 665.12." *Id.* at 65,461. Thus, among other things, the Final Rule increased the incidental take limit for log-

gerhead sea turtles from 17 per year to 46 per year and eliminated the restriction that limited swordfish longlining to 2,120 sets per year.

Plaintiffs and Federal Defendants submitted the proposed consent decree to the Court on October 13, 2010 as part of the Joint Motion. The substantive provisions of the proposed consent decree provide as follows: (1) those portions of the 2008 BiOp and ITS that relate to loggerhead and leatherback sea turtles are vacated and remanded to Federal Defendants (Stip. Inj. ¶ 1); (2) those portions of the Final Rule that relate to the incidental take of loggerhead and leatherback sea turtles are vacated and remanded to Federal Defendants (*id.* ¶ 2); (3) the incidental take limits for loggerhead and leatherback sea turtles that were in place before the Final Rule was issued are reinstated [4] (*id.* ¶ 3); (4) after the Court enters the Stipulated Injunction, NMFS must promulgate a rule to formalize the change in incidental take limits for loggerhead and leatherback sea turtles (*id.* ¶ 4); (5) NMFS cannot increase the incidental take limits for leatherback or loggerhead sea turtles by the Fishery unless NMFS prepares a new biological opinion and issues a new regula-

tion (*id.* ¶ 5); (6) NMFS must issue a new biological opinion for the Fishery no later than 135 days after NMFS makes a final determination on its proposed listing of nine distinct population segments of listed loggerhead sea turtles (*id.* ¶ 6); (7) all of Plaintiffs' claims are dismissed with prejudice (*id.* ¶ 17).

Thus, under the terms of the proposed consent decree, the Final Rule will remain in place, but the incidental take limits for loggerhead and leatherback sea turtles will revert back to the levels existing prior to the Final Rule.[5] The proposed consent decree also requires that NMFS complete a new biological opinion within 135 days after it makes a final determination of its pending proposed listing of nine distinct population segments of listed loggerhead sea turtles.[6] NMFS indicates that it plans to complete its loggerhead turtle distinct population segment listing determination by March 16, 2011, which would make the new Fishery biological opinion due approximately on July 31, 2011. (*Id.*)

## II. *Applicability of Environmental Statutes*

 HLA argues primarily that the proposed consent decree is contrary to law

---

**4.** Specifically, the incidental take limits for loggerhead and leatherback sea turtles established under the regulations published at 69 Fed.Reg. 17329 (Apr. 2, 2004) and the associated biological opinion and incidental take statement that relate to loggerhead and leatherback sea turtles are reinstated. (Stip. Inj. ¶ 3.)

**5.** Although paragraphs 1 through 3 of the proposed consent decree apply to both loggerhead and leatherback sea turtles (Stip. Inj. ¶¶ 1–3), in actuality, they only affect loggerhead sea turtles because the Final Rule did not change incidental take limits for leatherback sea turtles (*see* 74 Fed.Reg. 65,460 (Dec. 18, 2009); 69 Fed.Reg. 17329 (Apr. 2, 2004)). Therefore, the proposed consent decree reduces the incidental take limit for loggerhead

sea turtles from 46 to 17, but the incidental take limit for leatherback sea turtles remains at 16.

**6.** This deadline is meant to prevent NMFS from having to redo its biological opinion twice in the span of two years. (Joint Mot. at 3.) Apparently, the loggerhead sea turtle is currently listed as one species, but NMFS has issued a proposed listing rule to change the listing status of loggerhead sea turtles into nine distinct population segments. (*Id.*) Plaintiffs and Federal Defendants represent that because this change could affect any biological opinion analysis related to the Fishery, it would be "prudent" to await the final loggerhead distinct population segment listing determination prior to embarking on the new Fishery biological opinion analysis. (*Id.*)

because it allows Federal Defendants to circumvent the reach of the Administrative Procedure Act ("APA"), the Magnuson–Stevens Fishery Conservation and Management Act ("MSA"), the Endangered Species Act ("ESA"), and the National Environmental Policy Act ("NEPA") as well as their corresponding regulatory schemes. HLA's assertion hinges on the applicability of these statutes to consent decrees and Federal Defendants' ability to enter into consent decrees. Because a consent decree is a "judicial act" rather than an agency act, Federal Defendants are not required to ensure that their stipulation to the proposed consent decree complies with these statutes.

■ As a preliminary matter, "[A] consent decree has attributes of both a contract and a judicial act." *Wicker v. Oregon ex rel. Bureau of Labor,* 543 F.3d 1168, 1173–74 (9th Cir.2008). "Consent decrees entered in federal court must be directed to protecting federal interests." *Frew v. Hawkins,* 540 U.S. 431, 437, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004). The Supreme Court has characterized a consent decree as "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail,* 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); *Frew,* 540 U.S. at 437, 124 S.Ct. 899 (same). Further, "[a] consent decree is a judgment, has the force of res judicata, and it may be enforced by judicial

sanctions, including ... citations for contempt." *Randolph,* 736 F.2d at 528. A court may also "modify a consent decree in certain circumstances over the objection of a signatory." *Local No. 93,* 478 U.S. at 518, 106 S.Ct. 3063 (citation omitted). Accordingly, although a contract between parties, a consent decree's enforcement is entirely dependent upon judicial act. As discussed *infra,* the statutes and regulations relied upon by HLA do not contemplate their applicability to consent decrees.[7]

Perhaps best illustrative of this principle is *Home Builders Associations of Northern California v. Norton,* 293 F.Supp.2d 1 (D.D.C.2002). There, the plaintiffs sought review under the APA and the ESA of the Secretary of the Interior's decision to designate 4.1 million acres as a critical habitat for an endangered frog. *Id.* at 2. Similar to the instant case, before the *Home Builders* court was a consent decree proposing both to vacate all habitat designations and to remand to the agency "for a new rulemaking." *Id.* An intervenor-defendant that was not a party to the settlement, as here, disagreed with the terms of the consent decree and argued they violated the APA and the ESA. *Id.* at 2–3. The *Home Builders* court reviewed the consent decree and found that it was "fair, adequate and reasonable under the facts, and should be entered." *Id.* at 3. It went on to dispose of the intervenor-defendant's argument that the consent decree violated the notice and comment requirements of 5

---

**7.** In their supplemental brief, HLA questions whether the proposed consent decree is actually a consent decree. (HLA Supp. Br. at 3–4.) The Court finds that it is. As HLA points out, a consent decree is a settlement by parties that is "subject to continued judicial policing." *See Oregon,* 913 F.2d at 580. Despite HLA's arguments to the contrary, the Court is required to police and oversee the proposed consent decree here. For instance,

a major concern of HLA's is that Federal Defendants will be able to circumvent statutory deadlines by perpetually delaying a decision as to the loggerhead sea turtle status. Because this is a consent decree, the Court in this scenario would be able to modify the terms of the consent decree over Federal Defendants' objection if the circumstances warranted. *Local No. 93,* 478 U.S. at 518, 106 S.Ct. 3063.

U.S.C. § 553, the APA, by noting that the a consent decree is a "judicial act" and that "adoption of a consent decree is not an agency act under the APA." *Home Builders*, 293 F.Supp.2d at 5 (quotations and citations omitted).

HLA relies heavily on *United States v. Carpenter*, 526 F.3d 1237 (9th Cir.2008), to argue that entering into a consent decree is agency action, which would trigger these statutes. The Court is not persuaded. At issue in *Carpenter* was a road in Elko County, Nevada. *Id.* at 1238. In 1999, the United States Forest Service sued residents of Elko County, Nevada who were restoring the road. *Id.* at 1238–39. The road was adjacent to a river populated by Bull Trout, a threatened species, and the United States was concerned about the restoration's potential effect on the trout population. *Id.* at 1239. Soon after, Elko County was added as a defendant, and it counterclaimed against the United States on the basis that title to an easement for the roadway should be quieted. *Id.* Ultimately the parties settled in front of a magistrate judge. *Id.* The terms of the agreement provided as follows:

> The United States agreed that it would not contest that Elko County had a right of way to the road, but did not waive its authority to manage federal lands and natural resources in accordance with federal environmental laws. [Elko County] agreed that they would not do any work on the road without receiving prior approval from the Forest Service and that they would comply with federal environmental laws.

*Id.* After an appeal, the intervenor environmentalists filed cross-claims against the United States pursuant to the APA and challenged the terms of the settlement agreement as violative of NEPA. *Id.* The district court judge dismissed the cross-claims believing that the Attorney General's decision to settle litigation was not reviewable under the APA. *Id.* On appeal the intervenors alleged that the United States granted Elko County a property interest in public land without complying with the procedural mechanisms for relinquishing title. *Id.* at 1242. The Ninth Circuit agreed and held that the cross-claims were reviewable under the APA. *Id.* Specifically, the Ninth Circuit noted:

> [P]lenary power means absolute authority to pursue legitimate objectives and does not include license to agree to settlement terms that would violate the civil laws governing the agency. We find the Fourth Circuit's reasoning persuasive in this case. We agree with its statement that, we think it alien to our concept of law to allow the chief legal officer of the country to violate its laws under the cover of settling litigation. The Attorney General's authority to settle litigation for its government clients stops at the walls of illegality.

*Id.* (citations and quotations omitted).

The instant case is easily distinguishable from *Carpenter*. As a preliminary matter, the Court has before it a proposed consent decree, which was not before the court in *Carpenter*. Further, Federal Defendants are in no way relinquishing rights in land or otherwise to Plaintiffs. Indeed, the procedural posture here is completely different than in *Carpenter*. Here, Plaintiffs challenged Federal Defendants' new regulations for failing to comply with the MBTA, the ESA, the MMPA, the MSA, and the APA. (FAC at 2–3.) After months of negotiations, Plaintiffs and Federal Defendants agreed to terms via a *temporary* agreement implemented by consent decree whereby Plaintiffs are granted relief for alleged ESA and MSA violations contained in Counts II and III of the First Amended Complaint. (Pls. Supp. Br. at 2.) Specifically, the loggerhead sea turtle incidental

take limit returns temporarily to its 2004 level, until NMFS completes a new biological opinion and incidental take statement in compliance with the appropriate rules and regulations. (Stip. Inj. ¶¶ 4, 6, 12.) In the interim, a temporary amalgam of the 2009 Regulations and the 2004 Regulations governs. In *Carpenter*, by contrast, the United States simply agreed that Elko County had a right-of-way near a listed species' habitat without considering the potential consequences. There were no prior regulations at issue, nor was the agreement temporary. Indeed, the instant case is quite far removed from *Carpenter*.

Instead, the proposed consent decree partially vacates the current biological opinion and incidental take statement. (Stip. Inj. ¶ 4.) This relief is consistent with the general rule that pre-existing regulations become effective after a vacatur.[8] *See Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir.2005) ("The effect of invalidating an agency rule is to reinstate the rule previously in force."); *CropLife Am. v. EPA*, 329 F.3d 876, 884–85 (D.C.Cir.2003) (finding after vacatur that "[t]he consequence is that the agency's previous practice ... is reinstated and remains in effect unless and until it is replaced by a lawfully promulgated regulation"); *see also Citizens for Better Forestry v. U.S. Dep't of Agric.*, 632 F.Supp.2d 968, 982 (N.D.Cal. 2009) (finding that a regulation that did not satisfy the ESA's requirements was invalidated and that "[t]he effect of invalidating an agency rule is to reinstate the rule previously in force" (internal quotations omitted)).

By its argument, HLA would have the Court craft a rule whereby a federal agency could not settle a claim against it via consent decree without first revisiting the same procedures that gave rise to the regulation at issue in the litigation. This would not only strip the parties of the ability to settle, contrary to strong public policy, *see Leppind v. Mukasey*, 530 F.3d 862, 863 (9th Cir.2008), it would also divest this Court of its meaningful oversight function in the consent decree process. Indeed, this rule would render consent decrees a virtual nullity, which cannot be correct, particularly in light of the strong public policy favoring settlement.

The plain language of the statutes themselves also demonstrates that they are inapplicable to consent decrees.

### A. Administrative Procedure Act ("APA")

The APA provides, *inter alia*, that federal agencies must follow certain procedures, such as providing for public notice and comment before "rulemaking." 5 U.S.C. § 553(b). For the purposes of the statute, amending or repealing a rule requires recommencing the rulemaking process. *Id.* HLA argues that "the proposed stipulated injunction would accomplish exactly what Congress determined a federal agency cannot do: promulgate, amend, and repeal a rulemaking without public notice and comment." (Opp'n at 13.) The Court disagrees.

As noted, a consent decree is a judicial act, rather than an agency act. *See Nor-*

---

**8.** It is worthy of note that in the environmental context, courts consider the well-being of the species in determining whether to vacate an erroneously promulgated rule or regulation. Indeed, where the defectively issued rule is more protective of the species, a court, in its equitable discretion, may keep the defective regulation in effect during a remand.

*See, e.g., Natural Res. Def. Council v. U.S. Dept. of Interior*, 275 F.Supp.2d 1136, 1145–46 (C.D.Cal.2002). Consistent with this principle, the Court finds that the vacatur in the proposed consent decree is more protective of loggerhead sea turtles because it reduces the total number of permissible interactions from forty-six per year to seventeen.

*ton,* 293 F.Supp.2d at 5 ("As such, the Court does not find that the notice and comment requirements of 5 U.S.C. § 553 apply before the Court's adoption of a consent decree, as adoption of a consent decree is not an agency act under the APA."); *Citizens for a Better Env't v. Gorsuch,* 718 F.2d 1117, 1136 (D.C.Cir.1983) (Wilkey, J., dissenting) ("This court has previously ruled that the consent decree at issue here does not rise to the level of a rulemaking."); *Id.* ("The commitment that occurs through a consent decree takes place, however, without recourse to the public notice requirements of notice and comment rulemaking."). Accordingly, the APA is not applicable to the proposed consent decree.

Further, the case law upon which HLA relies to bolster this proposition, *Consumer Energy Council v. Fed. Energy Regulatory Comm'n,* 673 F.2d 425 (D.C.Cir.1982), contemplated that "notice and an opportunity to comment [must] be provided prior to *agency* decisions to repeal a rule." *Id.* at 446 (emphasis added). As noted, this is not agency action, but judicial act. To the extent HLA argues otherwise, it is simply incorrect. Paragraph 4 of the proposed consent decree states:

> Following the entry of this Stipulated Injunction, *as an order of the Court* NMFS shall initiate appropriate rulemaking to implement the amount of annual incidental take for loggerhead and leatherback sea turtles as set forth in the 2004 Regulations identified in Paragraph 3.

(Stip. Inj. ¶ 4 (emphasis added).) Thus, the language of the proposed consent decree itself suggests this is not agency action but instead judicial act.[9] Nothing in the APA contemplates its applicability to a judicial act, and therefore the APA is inapplicable to the Court's present inquiry.

### B. *Magnuson–Stevens Fishery Conservation and Management Act ("MSA")*

HLA alleges that the proposed consent decree runs afoul of the MSA in three ways: procedurally, substantively, and by violating the judicial review provisions of the MSA. (Opp'n at 15–21.) The Court is not persuaded. The MSA is a comprehensive national program designed to promote and manage domestic commercial fisheries. *See* 16 U.S.C. § 1801(b) (describing the purposes of the act to be, *inter alia,* "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles"). Congress accomplished these goals, in part, through the development of regional fishery management councils, which propose fishery management plans ("FMPs") to regulate fisheries within their region. *Id.* § 1852. The Western and Central Pacific fisheries are managed by the Western Pacific Council. *Id.* § 1852(a)(1)(H). The MSA and its regulations also establish the procedural and substantive requirements applicable to MSA regulations implement-

---

9. By contrast, Federal Defendants must thereafter "issue a new biological opinion and new incidental take statement." (Stip. Inj. ¶ 6.) This will, without question, be an agency act subject to the APA. *See Ramsey v. Kantor,* 96 F.3d 434, 443 n. 16 (9th Cir.1996) ("[A]ctions *subsequently* taken through or under the plan cannot be considered actions by the Judicia-ry." (emphasis added)). Indeed, the proposed consent decree acknowledges this by noting that "[n]o provision of this Stipulated Injunction shall be interpreted as or· constitute a commitment or requirement that the Federal Defendants take action in contravention of any law or regulation, either substantive or procedural." (Stip. Inj. ¶ 12.)

ing FMP amendments as well as the content of the FMP amendments themselves. *Id.* §§ 1851–1856.

The MSA is simply inapplicable to the instant action. Not only is this proposed consent decree a judicial act, but the plain language of the MSA makes clear that its governing provisions are applicable to an FMP prepared by a fishery management council, such as the Western Pacific Council, or the Secretary of the Department of Commerce. *See, e.g.,* 16 U.S.C. § 1852(h) ("*Each Council shall,* in accordance with the provisions of this chapter . . . ." (emphasis added)); 16 U.S.C. § 1853(a) ("Any fishery management plan which is *prepared by any Council, or by the Secretary with respect to any fishery, shall* . . . ." (emphasis added)); 16 U.S.C. § 1853(b) (same); 16 U.S.C. § 1854(a) ("Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, *the Secretary* shall . . . ." (emphasis added)). This is not the scenario here. Neither the Western Pacific Council nor the Commerce Secretary is preparing an FMP. Instead, the Federal Defendants are stipulating to enter into a proposed consent decree. There is simply no indication that the MSA was intended to govern the terms of a consent decree.[10]

## C. *Endangered Species Act ("ESA")*

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1536. To this end,

the ESA regulatory regime has established an interagency consultation process to ensure that federal actions do not jeopardize listed species. *See* 50 C.F.R § 402.14. Specifically, a federal agency that wishes to carry out an action that "may affect" a listed species or critical habitat must formally consult with either the United States Fish and Wildlife Service or NMFS.[11] *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13, 402.14. During consultation, NMFS must review all relevant information to formulate "its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(1)-(4). This opinion must provide a summary of the information on which the opinion is based, a discussion of the effects of the action listed on species or critical habitat, and an opinion on whether the action is likely to jeopardize the continued existence of a listed species. *Id.* § 402.14(h). If the NMFS concludes that an action is not likely to jeopardize the continued existence of a listed species, it must also issue an incidental take statement based on its biological opinion, which specifies the amount or extent of incidental take. *Id.* § 402.14(i). The ESA also requires that the consulting agency base its biological opinion on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

HLA argues that Federal Defendants have not complied with the ESA requirements before entering into the proposed

---

**10.** Indeed, HLA cites to no regulation, statute, caselaw, or other authority to suggest otherwise.

**11.** Here, NMFS is both the acting and consulting agency. In such a scenario NMFS would have to consult with itself. *See* 16

U.S.C. § 1536(a)(2); *see also Greenpeace Foundation v. Mineta,* 122 F.Supp.2d 1123, 1127 n. 5 (D.Haw.2000) (noting that where "NMFS is both the acting and consulting agency . . . NMFS consults with itself").

consent decree. Specifically, HLA argues that the ESA has been violated in the following five ways: (1) the ESA does not grant NMFS authority or discretion to vacate all or portions of a biological opinion or incidental take statement; (2) the 2004 biological opinion does not analyze the effects of Amendment 18; (3) the 2004 incidental take statement does not authorize the expected incidental take from Amendment 18 and is not based upon the best available scientific and commercial data; (4) the proposed consent decree violates statutory deadlines for the consultation process; and (5) there was no consultation. (Opp'n at 25–32.) The Court does not agree.

As with the APA and the MSA, the ESA does not contemplate its applicability to judicial act. Instead, by its plain language, it requires federal agencies taking action that could potentially threaten a listed species' habitat to comply with its terms. *See, e.g.*, 16 U.S.C. § 1536(a)(2) (*"Each Federal agency* shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary." (emphasis added)); 50 C.F.R. §§ 402.13 ("Informal consultation is an optional process that includes all discussions, correspondence, etc., *between the Service and the Federal agency* or the designated non-Federal representative, *designed to assist the Federal agency* in determining whether formal consultation or a conference is required."). Accordingly, in the absence of authority to the contrary, the Court sees no reason to apply the ESA's requirements to a consent decree.

D. *National Environmental Policy Act ("NEPA")*

NEPA requires, *inter alia*, that federal agencies that implement regulations to prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. As with the ESA, the MSA, and the APA, the Court is not persuaded that the Federal Defendants have implemented a regulation such that it must prepare an EIS. Instead it has agreed to a proposed consent decree and, pursuant to judicial act, one portion of Amendment 18 is vacated. NEPA does not contemplate its applicability to judicial act and is therefore not applicable here.

For these reasons, the Court cannot find that the proposed consent decree is contrary to the APA, the MSA, the ESA, or NEPA.

III. *Fair, Reasonable, and Equitable*

A. *Fairness*

██ " 'Fairness should be evaluated from the standpoint of signatories and nonparties to the decree.' " *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir.1991) (quoting *United States v. Conservation Chem. Co.*, 628 F.Supp. 391, 401 (W.D.Mo.1985)). In determining whether a proposed consent decree is fair, courts examine both procedural and substantive fairness. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir.1990); *United States v. Chevron U.S.A. Inc.*, 380 F.Supp.2d 1104, 1111 (N.D.Cal.2005); *Telluride Co.*, 849 F.Supp. at 1402; *United States v. BP Exploration & Oil Co.*, 167 F.Supp.2d 1045, 1051–52 (N.D.Ind.2001).

1. *Procedural Fairness*

██ First, courts examine procedural fairness to determine whether the negotia-

tion process was " 'fair and full of adversarial vigor.' " *Chevron*, 380 F.Supp.2d at 1111 (quoting *Telluride*, 849 F.Supp. at 1402). If the decree is the product of " 'good faith, arms-length negotiations,' " it is " 'presumptively valid.' " *Chevron*, 380 F.Supp.2d at 1111 (quoting *Oregon*, 913 F.2d at 581); *see also Cannons Eng'g Corp.*, 899 F.2d at 87 n. 4.

It is readily apparent that the proposed consent decree is procedurally fair. Although the terms of the proposed consent decree are relatively straightforward, the parties nevertheless engaged in more than three months of negotiations. (*See* Pls. Supp. Br., Achitoff Decl. ¶ 3.) Apparently, during the course of negotiations, Plaintiffs' and Federal Defendants' ability to ultimately settle the case "was often in doubt." (*Id.*) Even after Plaintiffs and Federal Defendants agreed to the terms of the proposed consent decree, the federal government conducted its own review of the proposed consent decree prior to its submission to this Court. In this Court's experience, Plaintiffs' and Federal Defendants' interests have seldom been aligned, and Federal Defendants even opposed Plaintiffs' Motion for Partial Summary Judgment in the instant lawsuit (*see* Docs. ## 76, 77). Based on Plaintiffs' and Federal Defendants' dealings, as well as the information currently before the Court, there is nothing to suggest that the proposed consent decree resulted from anything other than "good faith, arms-length negotiations." *See Oregon*, 913 F.2d at 581. Accordingly, the Court concludes that the proposed consent decree is procedurally fair.

### 2. *Substantive Fairness*

■■ Second, courts examine the substantive fairness of the proposal. In evaluating the substantive fairness, it is "important for the district court to be fully informed regarding the costs and benefits of the decree." *Chevron U.S.A. Inc.*, 380 F.Supp.2d at 1113 (citing *Montrose Chem. Corp.*, 50 F.3d at 746). "[I]t is not the duty of the court to determine whether 'the settlement is one which the court itself might have fashioned, or considers ideal.' " *Chevron U.S.A. Inc.*, 380 F.Supp.2d at 1111 (quoting *Cannons*, 899 F.2d at 84) (internal quotations omitted); *see also BP Exploration*, 167 F.Supp.2d at 1050 (stating that a court should refrain from "substitut[ing] its judgment for that of the parties"). Rather, substantive fairness "mirrors the requirement that the [consent] decree be equitable." *Telluride*, 849 F.Supp. at 1402. "[T]he court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Oregon*, 913 F.2d at 581 (internal quotations omitted).

The proposed consent decree embodies a carefully negotiated compromise, the terms of which reflect the relief prioritized by the parties. Plaintiffs sought to have Amendment 18 invalidated in its entirety, and Federal Defendants argued that Amendment 18 was promulgated in compliance with the relevant statutes and regulations. Reflecting Plaintiffs' and Federal Defendants' compromise, the proposed consent decree vacates and remands only a portion of Amendment 18, and the rest remains in full force and effect. Specifically, Plaintiffs and Federal Defendants agreed as follows: in exchange for Federal Defendants' agreement to reduce the incidental take limit of loggerhead sea turtles from 46 to 17 per year, back to the 2004 levels, Plaintiffs will forego their challenge to both the Final Rule's authorization to take migratory birds and its removal of the annual limit on the shallow-set fishing effort. In reaching this agreement, neither Plaintiffs nor Federal Defendants received the measure of relief they would

have obtained had they prevailed on the merits.

Furthermore, by setting a defined period of time within which the new biological opinion must be promulgated, HLA is not unduly harmed by the proposed consent decree. Based upon NMFS's estimated time frame for completion of the new biological opinion (*see* Joint Mot. at 3), the Fishery will likely be operating at the lower incidental take limits for a period of six months. From 2004 until Amendment 18 was promulgated in 2010, the regulations permitted an incidental take of 17 loggerhead sea turtles per year. During this time, the Fishery reached the incidental take limit only once, in 2006. *See* National Marine Fisheries Service Pacific Island Regional Office, Sea Turtle Interactions, http://www.fpir.noaa.gov/SFD/SFD_turtleint.html. HLA argues that its historical interactions are not probative because from 2004 until 2010, when the Final Rule became effective, there was a 2,190 set limit on the shallow-set fishery. Amendment 18 removed that limitation from the shallow-set fishing effort. To the contrary, the Court finds that the historical interactions are probative. The Final Rule became effective on January 11, 2010, and the Fishery operated under its terms for that year. Despite having an unlimited number of sets, the Fishery still only had a total of 7 interactions with loggerhead sea turtles for the entire year.[12] Unless the incidental interactions more than double from 2010 to 2011, and the Fishery somehow reaches the reduced incidental take limit for loggerhead sea turtles before NMFS issues the new biological opinion,

the Fishery should not be unduly harmed by the proposed consent decree. Even if NMFS does not complete the new biological opinion by its estimated deadline, the proposed consent decree still does not unreasonably extend the period of time during which the Fishery must operate under the 2004 levels.

Finally, if the Fishery does reach the reduced incidental take limits for loggerhead sea turtles before NMFS issues the new biological opinion and the Fishery must be shut down, this result would be consistent with the goals of the ESA and in the public's interest. *See Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) ("The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."). At a time when NMFS is investigating whether to uplist the loggerhead sea turtle from threatened to endangered, it is a prudent measure to reduce the incidental take limits while NMFS is making this determination.

## B. *Reasonableness*

A careful and searching review of the proposed consent decree reveals that it is reasonable. The primary effect of the proposed consent decree is to reduce the incidental take limit of loggerhead sea turtles to the 2004 level. Loggerhead sea turtles have been listed as threatened for many years, and as discussed, the NMFS has recently proposed to list them as endangered. 75 Fed.Reg. 12598 (Mar. 16, 2010). By reducing the Fishery's incidental take limit for loggerhead sea turtles from 46 to

---

**12.** Four loggerhead sea turtle interactions have occurred in the Fishery to date in 2011. *See* National Marine Fisheries Service Pacific Island Regional Office, Sea Turtle Interactions, http://www.fpir.noaa.gov/SFD/SFD—turtleint.html. However, the Court will not speculate as to how many total interactions

the Fishery will have with loggerhead sea turtles in 2011. Based on the historical interactions with loggerhead sea turtles, the proposed consent decree will not unduly harm the Fishery, especially because the reduced incidental take limit will be in effect for only a limited period of time.

17, the proposed consent decree reduces the risk of harm to loggerhead sea turtles while NMFS prepares a new biological opinion assessing the proposed change in status of the loggerhead sea turtle as endangered. The risk of harm without the proposed consent decree is particularly acute because Amendment 18 removed the annual limit on the shallow-set fishing effort.

Furthermore, the alternative to the proposed consent decree is litigation of the merits of the case. HLA downplays the significance of such litigation here because the instant lawsuit challenges the actions of an administrative agency such that the record review rule applies, and the merits of the case could be resolved by motions for summary judgment. (HLA Supp. Br. at 31 n. 25.) This argument overlooks the fact that voluntary settlement of litigation is the preferable course of action. *See Ahern*, 846 F.2d at 48.

HLA argues that the proposed consent decree is unreasonable because it is scientifically unsound. (Opp'n at 35–36.) Provided that the proposed consent decree is fair, reasonable, and equitable, and does not violate the law or public policy, it need not utilize the best scientific evidence. Such a requirement would transform evaluation of a proposed consent decree into a decision on the merits in contravention of controlling authority. *See Oregon*, 913 F.2d at 582.

## IV. *Other Considerations*

### A. *Public Interest*

Here, because the parties seek to incorporate their settlement into a court order, and because public interests are at stake, the Court must make an independent and searching inquiry, carefully scrutinizing the proposed consent decree. *Oregon*, 913 F.2d at 581 (recognizing that when a consent decree affects the public interest, the Ninth Circuit has imposed a duty on the court to protect those interests); *Miami*, 664 F.2d at 441 ("If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed."); *Telluride Co.*, 849 F.Supp. at 1402. However, "the court need not require that the decree be 'in the public's *best* interest' if it is otherwise reasonable." *Oregon*, 913 F.2d at 581 (quoting *Randolph*, 736 F.2d at 529).

Whether a consent decree is within the public interest in part depends on whether it is "consistent with the statute that the judgment was meant to enforce." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1128 (D.C.Cir.1983). The two statutes most implicated by the proposed consent decree are the ESA and the MSA.

The purpose of the ESA is to conserve endangered and threatened species and their ecosystems.[13] 16 U.S.C. § 1531(b); *see also Tenn. Valley Auth.*, 437 U.S. at 174, 98 S.Ct. 2279 ("[E]xamination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities."). In furtherance of these policies, the proposed consent decree temporarily reduces the yearly incidental take limits for loggerhead sea turtles from forty-seven to seventeen while the NMFS determines whether to uplist the turtles from threatened to endangered.

As noted, the purpose of the MSA is "to take immediate action to conserve and manage the fishery resources found off the

---

**13.** The ESA defines *conserve* as "us[ing] ... all methods and procedures ... necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3).

coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles." *See* 16 U.S.C. § 1801(b). The proposed consent decree furthers these objectives because it does not reinstate the 2,190 set limit, thus promoting fishing efforts, yet it decreases the incidental interactions permitted with loggerhead sea turtles in an effort to conserve the species.

In any event, the Ninth Circuit is here clear. "[P]reserving environmental resources is certainly in the public's interest." *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir.2008) (en banc) *overruled in part on other grounds as recognized by Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir.2009). Accordingly, the Court finds that the proposed consent decree is in the public interest.

### B. *Agency Discretion*

■ When a government agency is the target of a consent decree, the Court must ensure that the proposed consent decree does not unduly constrain the agency's discretion. *See Gorsuch*, 718 F.2d at 1129. Here, the terms of the proposed consent decree will remain in place, and NMFS will be precluded from increasing the incidental take limits for leatherback or loggerhead sea turtles, only until NMFS prepares a new biological opinion and issues a new regulation. (*See* Stip. Inj. ¶ 5.) Pursuant to the proposed consent decree, NMFS must prepare this new biological opinion within 135 days of finalization of its loggerhead sea turtle distinct population segment ("DPS") determination. (*Id.* ¶ 6.) Al-

though the proposed consent decree does not set forth a specific date for completion of the biological opinion, the time period during which NMFS must operate under the proposed consent decree is nonetheless limited. NMFS anticipates that it will finalize its loggerhead DPS determination by March 16, 2011 (Joint Mot. at 3), which would make the new biological opinion due by approximately July 31, 2011. Furthermore, because the loggerhead DPS determination may affect the new biological opinion, there is a legitimate reason for pegging the deadline for completion to finalization of the loggerhead DPS determination.

Additionally, nothing in the proposed consent decree dictates the outcome of the new biological opinion. NMFS is free to even increase the incidental take limits for loggerhead sea turtles provided that it complies with the law in promulgation of the new biological opinion. Given the limited duration of the proposed consent decree, and that it does not prescribe a particular outcome for the new biological opinion, the Court cannot conclude that the proposed consent decree unduly constrains agency discretion.

### V. *HLA's Additional Arguments*

■ HLA raises several additional arguments, not previously addressed. First, HLA emphasizes that it was not involved in the settlement negotiations, and argues that it is thus disadvantaged in opposing the proposed consent decree. (Opp'n at 34.) Even if HLA was in fact excluded from the settlement process,[14] the Government need not allow third parties to participate in settlement negotiations. *BP Exploration*, 167 F.Supp.2d at 1052; *see also Cannons Eng'g*, 899 F.2d at 93 (holding

---

14. There is some dispute as to whether HLA was in fact excluded from participating in the negotiations that ultimately produced the proposed consent decree. (Pls. Supp. Br. at 6; Fed. Defs. Supp. Br. at 3.)

that in the CERCLA context "the government is under no obligation to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes"). Furthermore, because Plaintiffs and Federal Defendants did not originally provide sufficient information as to whether the proposed consent decree was fair, reasonable, and equitable, the Court ordered supplemental briefing on precisely that issue. (Doc. # 131.) Plaintiffs' and Federal Defendants' supplemental briefs explain in detail why they believe that the proposed consent decree meets this standard. HLA was also provided the opportunity to respond to these supplemental briefs and rebut Plaintiffs' and Federal Defendants' respective arguments, which remedies HLA's complaint that it did not have adequate information to oppose the Joint Motion.[15] As noted, it was not necessary for HLA to be a part of the settlement negotiations, which ultimate led to the proposed consent decree.

Additionally, HLA provides additional arguments detailing the shortcomings it associates with the proposed consent decree's amalgamated rule. (HLA Supp. Br. at 15–28.) Specifically, HLA relies heavily on the declaration of Dr. Milani Chaloupka to argue that the goals of the proposed consent decree are technically flawed and contrary to the goals and purposes of the ESA and the MSA, (id. at 18–23), and that the proposed consent decree is harmful to and contrary to the public interest (id. at 28–29). HLA also argues there are alternative, suitable, terms of a consent decree. (Id. at 31–32.) Although couched as evidence that the proposed consent decree is not fair, reasonable, or equitable, the Court believes that this is, in fact, an attempt to reach the merits of the underlying dispute. As the Ninth Circuit has stated "approval of a negotiated agreement is not a decision on the merits and the court should not resolve underlying factual disputes at this stage." Oregon, 913 F.2d at 582. Instead, although "an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent." Local No. 93, 478 U.S. at 529, 106 S.Ct. 3063. HLA has had the opportunity to "air its objections" before the Court, and the Court, in turn, has duly considered them.[16] Accordingly, although HLA has withheld its consent, the Court may still enter the proposed consent decree.

Finally, HLA presents a theory of market transfer effect arguing that the 2004 regulations that "spring into effect" will actually be detrimental to the loggerhead sea turtle population despite lowering the incidental take levels. (Opp'n at 38–40; HLA Supp. Br. at 22–23.) Specifically, HLA contends that lower incidental take

**15.** To the extent that HLA argues it was entitled to discovery, the Court finds that directing Plaintiffs and Federal Defendants to submit supplemental briefing as to whether the proposed consent decree was fair, reasonable, and equitable more than sufficed.

**16.** At the hearing on this matter, the Court indicated that it was not inclined to have another hearing following the parties' submissions of their supplemental briefs. None of the parties objected to this proposition and none of the supplemental briefs request a further hearing. Because the Court has extensive experience adjudicating lawsuits pertaining to the Fishery, it does not require another hearing to determine whether the proposed consent decree meets the relevant standards. See Oregon, 913 F.2d at 582 (" 'The growing rule is that the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision.' " (quoting Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir.1977))).

levels will inadvertently cause more sea turtle mortalities in foreign fisheries. (*See* Opp'n at 39.) The Court is not persuaded. As Plaintiffs argued, the possibility that any turtles might be adversely affected by the settlement's approval is speculative at best. (Pls. Reply at 9.) This theory requires not only HLA's members to reach the loggerhead cap before NMFS has completed the new Biological Opinion, but also foreign nations must contemporaneously start fishing more and these foreign fisheries must catch more loggerhead sea turtles than HLA's members would have caught but for the hypothetical closure. This argument is too speculative to be persuasive.

## CONCLUSION

The Court has conducted an independent evaluation and a vigorous analysis of the proposed consent decree, and concludes that the proposed consent decree is "fair, reasonable and equitable and does not violate the law or public policy." *See Sierra Club*, 909 F.2d at 1355. For the reasons stated above, the Court GRANTS Plaintiffs' and Federal Defendants' Joint Motion (Doc. # 102) and APPROVES entry of the proposed consent decree. HLA's Motion for Summary Judgment (Doc. # 86) is DENIED AS MOOT.

IT IS SO ORDERED.

## ATTACHMENT 1

Turtle Island Restoration Network, the Center for Biological Diversity, and Kahea: The Hawaiian Environmental Alliance (collectively the "Plaintiffs"), and the United States Department of Commerce, the National Marine Fisheries Service, and Gary Locke, in his official capacity as Secretary of the Department of Commerce, (collectively the "Federal Defendants"), by and through the undersigned counsel, state as follows:

## ATTACHMENT 1—Continued

WHEREAS, on December 16, 2009, Plaintiffs filed a complaint in the action captioned *Turtle Island Restoration Network, et.al. v. Department of Commerce, et.al.,* Case No. 09–00598 DAE–KSC, in the United States District Court for the District of Hawai'i, alleging that the Federal Defendants violated the Endangered Species Act ("ESA"), the Migratory Bird Treaty Act ("MBTA"), the Marine Mammal Protection Act ("MMPA"), and the Administrative Procedure Act ("APA"), by issuing the final rule for the Hawai'i shallow-set (swordfish) longline fishery that, among other measures, removed fishing effort limitations and raised the allowable amount of incidental take of certain sea turtles, Dkt. No. 1;

WHEREAS, on January 22, 2010, the Hawaii Longline Association ("HLA") filed a complaint against the Federal Defendants in the action captioned *Hawaii Longline Association v. National Marine Fisheries Service,* Case No. 10–00044 DAE–KSC (D.Hi.), alleging that the Federal Defendants failed to make certain mandatory determinations required under the MMPA, ESA, and APA, to authorize the shallow-set longline fishery to incidentally take humpback whales;

WHEREAS, on February 12, 2010, this Court granted HLA's motion to intervene as a third party defendant in this action, Dkt. No. 20;

WHEREAS, on February 16, 2010, the Federal Defendants answered Plaintiffs' complaint, raising various defenses and denying that they had violated any requirements under law, Dkt. No. 21;

Whereas, on April 1, 2010, the Federal Defendants answered the HLA's complaint, raising various defenses and denying that they had violated any mandate under ESA, APA, or MMPA;

WHEREAS, on April 5, 2010, Plaintiffs' and HLA's complaints were consolidated by Order of the U.S. District Court, Dkt. No. 61;

WHEREAS, on June 24, 2010, by Order of the U.S. District Court, Plaintiffs' complaint was dismissed without prejudice for failure to properly plead jurisdiction under the Magnuson Stevens Fishery Conservation and Management Act ("MSA"), Dkt. No. 82;

WHEREAS, on June 24, 2010, Plaintiffs filed a first amended complaint, Dkt. No. 83;

WHEREAS, on July 8, 2010, the Federal Defendants answered the first amended complaint and denied violating the MMPA, ESA, MBTA, APA, or MSA, Dkt. No. 85;

WHEREAS, in order to avoid the costs and uncertainties of litigation, the Plaintiffs and Federal Defendants desire to settle all claims asserted in the Action;

NOW, THEREFORE, Plaintiffs and the Federal Defendants STIPULATE and move the Court to ORDER AS FOLLOWS:

1. Those portions of the Biological Opinion published on October 15, 2008 ("2008 BiOp"), and those portions of the accompanying Incidental Take Statement ("ITS"), that relate to loggerhead and leatherback turtles are hereby VACATED and remanded to the Federal Defendants for further consideration. All other provisions of the 2008 BiOp and the ITS remain in full force and effect.

2. Those portions of the regulations published at 74 Fed.Reg. 65460 (December 10, 2009), amended at 75 Fed.Reg. 1023 (January 8, 2010), and codified at 50 C.F.R. § 665.813(b) ("2009 Regulations"), that relate to the incidental take of loggerhead and leatherback sea turtles are hereby VACATED and remanded to the Federal Defendants. All other provisions of the 2009 Regulations remain in full force and effect.

3. The amount of incidental take for loggerhead and leatherback sea turtles established under the regulations published at 69 Fed.Reg. 17329 (April 2, 2004) ("2004 Regulations"), and those portions of the associated biological opinion and incidental take statement (published on February 23, 2004) that relate to loggerhead and leatherback sea turtles, are hereby reinstated.

4. Following the entry of this Stipulated Injunction, as an order of the Court NMFS shall initiate appropriate rulemaking to implement the amount of annual incidental take for loggerhead and leatherback sea turtles as set forth in the 2004 Regulations identified in Paragraph 3.

5. NMFS shall not increase allowable incidental take of leatherback and/or loggerhead sea turtles by the Hawaii-based shallow-set longline fishery above the limits set forth in the 2004 Regulations, except through new regulations issued under applicable authority and after completion of a new biological opinion based on the best available science.

6. NMFS shall issue a new biological opinion and a new incidental take statement for the Hawaii-based shallow-set longline fishery no later than 135 days after NMFS' final determination on its proposed listing of nine distinct population segments of listed loggerhead sea turtles 75 Fed.Reg. 12598 (March 16,

2010). The purpose of preparing the new biological opinion includes, but is not necessarily limited to, reconsideration of the issues raised by Plaintiffs in the instant litigation.

7. Plaintiffs and the Federal Defendants reserve the right to seek to have this Court modify this Stipulated Injunction on any grounds provided in Fed. R. Civ. Pro. 60(b).

8. In the event of a disagreement between Plaintiffs and the Federal Defendants concerning the interpretation or performance of any aspect of this Stipulated Injunction, the dissatisfied party shall provide the other party with written notice of the dispute and a request for negotiations. The parties shall confer in order to attempt to resolve the dispute within 14 days after receipt of the notice, or such time thereafter as is mutually agreed upon. If the parties are unable to resolve the dispute within 21 days after receipt of the notice, or such time thereafter as is mutually agreed upon, then either party may petition the Court to resolve the dispute. The Court will consider such future requests as it deems appropriate.

9. In the event that the Federal Defendants fail to meet any requirement specified in this Stipulated Injunction, Plaintiffs' first remedy shall be a motion to enforce the terms of this Stipulated Injunction. This Stipulated Injunction shall not, in the first instance, be enforceable through a proceeding for contempt of court.

10. The parties agree that Plaintiffs shall be entitled to recover their reasonable attorney fees, costs and expenses incurred in connection with this lawsuit, as described in the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or the ESA. The parties agree to attempt to resolve Plaintiffs' claim for fees and costs for all claims in this action expeditiously, without the need for Court intervention. By this Stipulated Injunction, the Federal Defendants do not waive any right to contest the amount of fees claimed by Plaintiffs or Plaintiffs' counsel, and do not waive any defense to such amount, including the hourly rate, in any future litigation or continuation of the present action. The parties further recognize that Plaintiffs reserve the right to seek additional fees and costs incurred arising from a need to apply to the Court for such an award, to enforce or defend against efforts to modify this Stipulated Injunction or for any other unforeseen continuation of this action.

11. If the parties cannot agree on the amount of such fees within 30 days of the Court approving this Stipulated Injunction, Plaintiffs may file a motion for attorneys' fees and costs with the Court in this matter.

12. No provision of this Stipulated Injunction shall be interpreted as or constitute a commitment or requirement that the Federal Defendants take action in contravention of any law or regulation, either substantive or procedural. Nothing in this Stipulated Injunction shall be construed to limit or modify the discretion accorded to Defendants by the ESA, MSA, MMPA, MBTA, APA, or the general principles of administrative law with re-

spect to the procedures to be followed in making any determination required herein, or as to the substance of any final determination.

13. Nothing in this Stipulated Injunction shall bar the Federal Defendants from acting on any matters covered herein in a time frame earlier than required by this Stipulated Injunction, or from taking additional actions not specified herein if the Federal Defendants determine such actions are appropriate under applicable law.

14. No provision of this Stipulated Injunction shall be interpreted as, or constitute, a commitment or requirement that the Federal Defendants are obligated to spend funds in violation of the Anti–Deficiency Act, 31 U.S.C. Section 1341, or any other provisions of law.

15. The parties agree that this Stipulated Injunction was negotiated in good faith and that entry of this Stipulated Injunction constitutes a settlement of claims that were vigorously contested, denied, and disputed by the parties. By entering into this Stipulated Injunction, the parties do not waive any defense, except that the Federal Defendants recognize that Plaintiffs are entitled to recover their reasonable attorney fees, costs and expenses as set out in Paragraph 9.

16. The undersigned representatives of the parties certify that they are fully authorized by the parties they represent to agree to the terms and conditions of this Stipulated Injunction and do hereby agree to the terms herein.

17. Upon entry of this Stipulated Injunction, Plaintiffs' complaint shall be dismissed with prejudice. The dismissal shall apply to and be binding upon the parties hereto and anyone acting on their behalf, including successors, employees, agents, elected and appointed officers, and assigns. Plaintiffs agree not to bring, assist any other party in bringing, or join the Federal Defendants or any other party in any court proceeding that concerns alleged violations of law identical to or significantly similar to the allegations in Plaintiffs' complaint.

18. This Stipulated Injunction does not constitute an admission or evidence of any fact, wrongdoing, misconduct, or liability on the part of the United States, including without limitation, the Federal Defendants, their officers, or any other person affiliated with them, or any interpretation of any applicable provision of law. This Stipulated Injunction has no precedential value and shall not be used as evidence in any other court proceeding or in any other settlement discussions.

19. Plaintiffs' sole judicial remedy to address the merits of any final action that may ensue from the Federal Defendants' performance of its obligations under this Stipulated Injunction is to file a separate lawsuit challenging such final action. The Federal Defendants reserve all defenses to any such suit. Nothing in this Stipulated Injunction alters or affects the standards for review of final agency action, or creates jurisdiction that otherwise would not exist to review agency action.

20. Notwithstanding the dismissal of this action, this Court retains jurisdiction to oversee compliance with the terms of this Stipulated Injunc-

tion and to resolve any dispute between the parties pertaining to it. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994).

21. The terms of this Stipulated Injunction constitute the entire agreement of the parties, and no statement, agreement or understanding, oral or written, which is not contained herein, shall be recognized or enforced.

22. The terms of this Stipulated Injunction shall become effective upon entry of an order by the Court ratifying this Stipulated Injunction.

SO ORDERED.